960 So.2d 310 (2007)
The TOWN OF HOMER, INC. d/b/a Homer Memorial Hospital, Plaintiff-Applicant,
v.
GENERAL DESIGN, INC. and Storer HVAC Management Corporation, Defendants-Respondents.
No. 42,027-CW.
Court of Appeal of Louisiana, Second Circuit.
May 30, 2007.
Rehearing Denied August 9, 2007.
*311 Colvin, Weaver & Cerniglia by James H. Colvin, Pamela N. Breedlove, Shreveport, for Applicant.
The Smitherman Law Firm by W. James Hill, III, Donald Lee Brice, Jr., Shreveport, for Respondents, General Design and Continental Casualty Company.
Robert Kennedy, Jr., Shreveport, for Third Party Respondent, Pro-Build Construction, Inc.
Before WILLIAMS, CARAWAY and LOLLEY, JJ.
CARAWAY, J.
Appellant sued the architectural firm it hired in 1984 for a major hospital renovation. The initial construction project costing over three million dollars was substantially completed in 1988. A few years later, appellant addressed the need for a parking lot and an addition for medical records storage for which the defendant performed additional architectural services. When defects developed regarding the medical records storage addition, appellant sued defendant for negligence and breach of contract. Defendant argued that the terms of the parties' earlier AIA contracts, executed in 1984 and 1985, required arbitration. After a hearing in which the trial court ruled in favor of arbitration, and a second hearing denying appellant's motion for a new trial, appellant sought this supervisory review. For *312 the following reasons, we reverse and remand for further proceedings.

Facts
Homer Memorial Hospital is owned by the Town of Homer (hereinafter collectively "HMH"). Allen W. Johnson ("Johnson") is an architect employed by defendant General Design, Inc. ("G.D.Inc."). Between the early 1980's and the mid-1990's, HMH and G.D. Inc., through Johnson, contracted for architectural services pertaining to various renovation work projects for the hospital. This dispute involves their contractual agreement or agreements applicable to the time period in question as related to a work project that occurred in 1992 (hereinafter the "Pro-Build Job"). Identification of the parties' contractual agreement pertaining to the Pro-Build Job, which allegedly involved architectural defects, will answer the issue of arbitration for this dispute.
In 1983, HMH decided to modernize and upgrade the hospital facilities to enhance care and attract more medical practitioners to its rural community. It hired G.D. Inc., and in particular, Johnson, to conduct a study covering "programming, consultant services, financial search and architectural services," for which services HMH was to pay G.D. Inc. $11,550. To effect their agreement, the parties executed a "Standard Form of Agreement Between Owner and Architect," AIA[1] Document B141-1977, effective May 8, 1984 (hereinafter the "1984 Consulting Agreement").
After Johnson's work and guidance, the major initial renovation project was advertised and let out for bids. As a result, HMH and McGinnis Brothers Construction, Inc., the low bidder, entered into a Standard Form of Agreement Between Owner and Contractor (AIA Document A101-1977) in September, 1986. The major renovation (hereinafter the "McGinnis Job") was for $3,391,089 and was substantially completed about two years later, on November 30, 1988. The McGinnis contract named G.D. Inc. the architect for the project.
G.D. Inc.'s basis for its present claim for arbitration arises from a second Standard Form of Agreement Between Owner and Architect (AIA Document B141-1977) (hereinafter the "1985 AIA Contract"). This second contract was executed in August 1985, yet was dated May 8, 1984, the same date HMH initially authorized G.D. Inc. to conduct its work on the preliminary feasibility study pursuant to the 1984 Consulting Agreement. Similar to the listing for the "Project" description contained in the original 1984 Consulting Agreement, the 1985 AIA Contract simply described "a remodeled facility for Homer Memorial Hospital" as its focus. The 1985 AIA Contract, like the initial contract, included a provision for arbitration in Article 9.1 of the printed AIA form providing that "[a]ll claims, disputes, and other matters in question between the parties to this Agreement, arising out of or relating to this Agreement or the breach thereof, shall be decided by arbitration. . . ."
Although the 1984 Consulting Agreement and the 1985 AIA Contract had the same date and were virtually identical on the same printed AIA form, there were certain changes made in the 1985 AIA Contract for compensation for services, in contrast to the 1984 Consulting Agreement's specific listing of the $11,550 consideration for the initial services. Additionally, the 1985 AIA Contract included a supplement dealing with the authority of G.D. Inc.'s architect, Johnson, as the "full-time project representative" for HMH and *313 special supplements to satisfy Farmers Home Administration ("FmHA") regulations.
At completion of the McGinnis Job, Johnson dealt with post-construction issues. On December 1, 1988, Johnson notified the State Fire Marshal that the Initial Renovation was complete. G.D. Inc.'s concluding billing statement submitted to HMH in February, 1989, calculated its fee for services on the McGinnis Job in accordance with the 1985 AIA Contract, as follows:

 Basic Fee through Bid Award:
 $3,391,089.00 (contract amount incl.
 change orders) × (7% × 80%) = $ 189,900.98
 Contract Administration:
 $3,391,089.00 × (7% × 20%) = 47,475.25
 Amount Earned to Date:
 Basic Fee Contract Drawings & Bid= $ 189,900.98
 Contract Administration ($47,475.25 ×
 100% Complete) = + 47,475.25
 ____________
 Total Earned to Date: 237,376.23
 Total Paid to Date: - 236,948.95
 ____________
 DUE AT THIS TIME: $ 427.28

In 1991, the HMH board of directors took steps for construction of a parking lot. In July 1991, Johnson transmitted two designs for a proposed parking lot addition. The preliminary plans called for low retaining walls and sloped earth embankments to improve drainage. After G.D. Inc. billed HMH $150 for the preliminary designs in August, Johnson followed up with a letter estimating construction costs at $38,100 excluding the earthwork. The hospital ultimately selected the Town of Homer's architect and engineering personnel to complete the parking lot in April or May, 1992.
In September 1991, planning began on a project for a building for medical supplies. In early 1992, G.D. Inc. prepared construction drawings for a proposed medical records storage facility. In July 1992, after an initial bid process resulting in a $240,000 bid, Pro-Build Construction, Inc. ("Pro-Build") was invited to bid on the proposed addition. Ultimately, after certain revisions to the project, Pro-Build's bid of $184,417 was accepted. The Standard Form of Agreement Between Owner and Contractor (AIA Document A101-1987) between Pro-Build and HMH was executed in which G.D. Inc. was listed as the architect.
As a result of the Pro-Build Job for the medical records building, problems arose and the present lawsuit ensued. The petition contains the following allegations of the problem:
IX.
During the project, the Louisiana State Fire Marshall (sic) took exception to the fact that the Medical Records Building was too close to the existing Hospital structure to allow sufficient ingress and egress by hospital staff transporting patients on a hospital gurney. To accommodate this need, the Fire Marshall (sic) required a minimum of eight feet of space between the existing structure and the new storage facility.
X.
In response to this requirement by the Louisiana State Fire Marshall (sic), General Design drafted plans to connect the previously existing hospital structure to the Medical Records Building itself with an enclosed corridor. This project will be referred to hereinafter as the "Corridor Revision." The Corridor Revision project was not completed until the summer of 1996.
XI.
The Corridor Revision design called for the destruction of a substantial part of the previously-existing brick facade, which had previously constituted the end *314 of the 20's wing, of the Hospital, specifically that point beginning at the ceiling of the 20's wing, extending to the underside of the roof, a space of approximately four feet.
XII.
The newly-created open space at the end of the 20's wing in the Hospital's ceiling area, which comprises four feet of space between the ceiling and the underside of the roof, caused a negative pressure environment, meaning that the Hospital's ceiling space began to draw outside air into the Hospital, instead of pushing air out of the Hospital, which is known as positive pressure.
XIII.
As a result of the negative pressure created by the opening of the 20's Wing facade, the Hospital began experiencing a phenomenon referred to as "indoor rain," which means that humid, moist Louisiana air was being drawn into the ceiling space, then condensing on the various pipes and structures contained in the ceiling space, and then, in turn, saturating all pipe insulation, as well as dripping into the walls of the patient rooms and offices below the ceiling. As a direct result of this design flaw, the Hospital has experienced numerous problems with mold, fungus, and other bacteria which are harmful to human beings.
The petition also alleges that a certificate of completion for the medical records storage project was not issued by G.D. Inc. until January 28, 1999.
After answering the suit, G.D. Inc. moved to stay the proceedings pending arbitration. The motion to stay detailed Johnson's architectural services provided for the medical records addition and the corridor revision, and argued that the parties agreed in the 1985 AIA Contract to resolve any disputes by arbitration. HMH argued that the 1992 business relations with G.D. Inc. and Johnson were conducted verbally, resulting in an oral contract. Johnson's affidavits filed as evidence detailed the history of G.D. Inc.'s business relationship with HMH from its inception in 1984 until the end of 1995. According to Johnson, the relationship was solely governed by written contracts executed between the parties in 1984 and 1985. Other affidavits along with numerous records and the minutes of HMH's board meetings were submitted into evidence contesting the application of a contract requiring arbitration for G.D. Inc.'s allegedly defective work.

Discussion
If any suit or proceedings be brought upon any issue referable to arbitration under an agreement in writing for arbitration, the court in which suit is pending, upon being satisfied that the issue involved in the suit or proceedings is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until an arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with the arbitration. La. R.S. 9:4202.
The failure of a party to arbitrate in accordance with the terms of an agreement may be raised either through a dilatory exception of prematurity demanding dismissal of the suit or by a motion to stay the proceedings pending arbitration. Wied v. TRCM, LLC, 30,106 (La.App.2d Cir.7/24/97), 698 So.2d 685. The defense that plaintiffs are not entitled to judicial relief because of a valid agreement to submit their claims to arbitration may be raised by the dilatory exception pleading *315 prematurity, La. C.C.P. art. 926[A](1), which is determined on the basis of the showing made at the in limine trial of the exception, including evidence introduced at the trial thereof. La. C.C.P. arts. 929, 930. When the issue is raised by the exception pleading prematurity, the defendant pleading the exception has the burden of showing the existence of a valid contract to arbitrate, by reason of which the judicial action is premature. Cook v. AAA Worldwide Travel Agency, 360 So.2d 839 (La. 1978); Tresch v. Kilgore, 03-0035 (La.App. 1st Cir.11/7/03), 868 So.2d 91. Once the court finds a valid and enforceable arbitration agreement, and a failure to comply therewith, the court shall order arbitration. Horseshoe Entertainment v. Lepinski, 40,753 (La.App.2d Cir.3/8/06), 923 So.2d 929, writ denied, 06-0792 (La.6/2/06), 929 So.2d 1259; Conagra Poultry Co. v. Collingsworth, 30,155 (La.App.2d Cir.1/21/98), 705 So.2d 1280.
G.D. Inc.'s "Motion for Stay" occurred 10½ months after its answer to the suit. In the first evidentiary hearing on the matter, Johnson's affidavit listed only the 1985 AIA Contract as the controlling agreement intended to cover all future renovations to the hospital. After the trial court ruled that the agreement controlled and arbitration was appropriate, HMH's motion for new trial brought in additional evidence challenging the 1985 AIA Contract's application as limited to the McGinnis Job. This additional evidence was received by the trial court along with Johnson's second affidavit which identified and urged the 1984 Consulting Agreement as also governing the parties' overall contractual arrangements. The 1985 AIA Contract contains provisions indicating that it was specifically tied to the McGinnis Job. Compensation for basic services in the 1984 Consulting Agreement was listed at "ten percent of construction cost" (paragraph 14.2.1), but was lowered to 7% in the 1985 AIA Contract for the McGinnis Job.[2] Additionally, specific supplements and addenda concerning FmHA's financing of the McGinnis Job were added to the 1985 AIA Contract.
In argument to this court, G.D. Inc. ambiguously asserts the application of one or both of these contracts as the master agreement intended to cover G.D. Inc.'s services for all future jobs. In a clear reference to only the 1984 Consulting Agreement, G.D. Inc. argues that:
Homer Hospital and General Design did that when they entered into a broad based contract for programming, consultant services, financial search and architectural services for the new and/or remodeled facility for Homer Hospital, which included a master plan for ongoing services, ongoing functions, ongoing construction, and ongoing phases of construction.
Its argument then shifts subtly in the very next sentence to both agreements as the controlling contracts, stating that "it was all covered in the 1984 Agreements. Each job (project) and/or phase stood under the 1984 Agreements." Later, after noting the specific changes made in the parties' contractual arrangement to accommodate FmHA financing for the McGinnis Job, G.D. Inc. argues "both [the 1984 Consulting Agreement and the 1985 AIA Agreement] were broad based and not limited to *316 any one specific construction project. The language of the 1984 Agreements clearly contemplated many services to be performed and many phases for a new and/or remodeled facility."
Upon careful study of the AIA formal agreements, we reject G.D. Inc.'s attempt to ride both contracts for the establishment of a perpetual contractual relationship between the parties for all future construction of hospital additions. First, the "Project" was to be defined on page one of the AIA form contracts with printed instructions for a "detailed description of Project location and scope." This was not done, as both the 1984 Consulting Agreement and the 1985 AIA Contract generically list a "remodeled facility for Homer Memorial Hospital, Homer, Louisiana" as the "Project." The alleged "master plan" or scope of the "Project" is never specified in these agreements, and nowhere are any ongoing or scheduled "phases" shown that might distinguish between the immediate McGinnis Job (1985), the parking lot addition (1991), the medical records storage facility (1992), and whatever else may still be contemplated for the future under the master plan.
Second, the AIA Document B141-1977 printed agreements used by the parties contain capitalized terms, such as "Project," "Construction Documents," "Construction Phase," and "Work" throughout. In paragraph 11.2 of these agreements, the form contract states that "[t]erms in this Agreement shall have the same meaning as those in AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement." Such 1977 (or pre-1977) AIA Document A201 form which coincides with these contracts and defines those critical terms was not produced in evidence by G.D. Inc.
Third, paragraph 13.1 of the 1985 AIA Contract indicates that the 1984 Consulting Agreement was superseded. The 1985 AIA Contract was back-dated to coincide with the date of the parties' initial consulting agreement and paragraph 13.1 states:
This Agreement represents the entire and integrated agreement between the Owner and the Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect.
The more specific features within the 1985 AIA Contract relate to the FmHA financing of the McGinnis Job. This supports HMH's contention that the 1985 AIA Contract (and its arbitration requirement) ended at the completion of the McGinnis Job and that the 1984 Consulting Agreement ended following the rendition of $11,550 worth of initial services.
Finally, in the AIA printed form contract now in dispute, Article 1 lists the architect's "Basic Services" to be provided from start to finish of a "Project," including the design development phase, the construction documents phase, the bidding or negotiations phase, and the administration of construction phase. Paragraph 1.7 of Article 1, then discusses additional services as follows:
1.7 ADDITIONAL SERVICES.
The following Services are not included in Basic Services unless so identified in Article 15. They shall be provided if authorized or confirmed in writing by the Owner, and they shall be paid for by the Owner as provided in this Agreement, in addition to the compensation for Basic Services.
* * * * *
1.7.4 Providing services relative to future facilities, systems and equipment *317 which are not intended to be constructed during the Construction Phase.
* * * * *
1.7.19 Providing services after issuance to the Owner of the final Certificate for Payment, or in the absence of a final Certificate for Payment, more than sixty days after the Date of Substantial Completion of the Work. . . .
These provisions indicate to us that services for "future facilities" "not intended to be constructed during the Construction Phase" were expressly excluded from the 1985 AIA Contract and likewise work by G.D. Inc. after substantial completion of the McGinnis Job was also excluded.
From the above review of the earlier agreements, we find that the 1985 AIA Contract might have become the governing document for the later 1992 medical records addition only if:
(i) the definition of "Project" and/or "Construction Phase" were proven by G.D. Inc. to include the medical records storage addition as intended by the parties in 1985;
(ii) the parties agreed in writing to extend the 1985 AIA Contract to govern their obligations regarding the medical records storage addition within the meaning of "additional services" under the contract; or
(iii) the parties agreed orally to "authorize" and extend the 1985 AIA Contract to govern their obligations regarding the medical records storage addition within the meaning of "additional services" under the prior written contract.
We have already ruled that the term "Project" in the 1985 AIA Contract did not identify a medical records storage facility as within the contemplation of the parties. To the contrary, the evidence shows that only the McGinnis Job was a planned construction project at that time. Additionally, there was never an oral authorization or confirmation in writing[3] that G.D. Inc.'s architect services extended in 1992 would be governed as "additional services" under the 1985 AIA Contract.
While the parties' pattern of dealings may have remained quite similar after the conclusion of the McGinnis Job, their earlier written contract required oral or written authorization so as to bring the governance of the prior contract into play. Moreover, unlike the billing set forth above for the McGinnis Job, the billing practices of G.D. Inc. after that project do not reveal that G.D. Inc. received 7% (or 10%) of the contract cost for the parking lot job or the Pro-Build Job. Johnson never explained in his affidavits how his invoices for services relating to those jobs were calculated. In the parties' course of dealings from the conclusion of the McGinnis Job through the Pro-Build Job, the correspondence, invoices and minutes of HMH's board of directors never make reference to the 1985 AIA Contract as the contract under which their ongoing dealings were governed. There is no provision in our law that required a written contract for G.D. Inc.'s professional services rendered to HMH in the 1990's, and the parties' earlier written contract governing the extremely larger McGinnis Job renovation expressly required a new meeting of minds by the parties in order to bring services relative to future facilities within the reach *318 of the express provisions of the earlier contract.

Conclusion
Accordingly, finding that no written contract existed mandating arbitration of HMH's claims, we reverse the ruling of the district court. The case is remanded to the trial court. Costs are assessed to General Design, Inc.
REVERSED AND REMANDED.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, GASKINS, CARAWAY and LOLLEY, JJ.
Rehearing denied.
NOTES
[1] The AIA designation identifies a series of standard industry forms drafted and copyrighted by The American Institute of Architects.
[2] The 1984 Consulting Agreement listed the 10% fee for basic services, hourly rates for additional services, and the special $11,550 fee which was a one-time fee outside the basic fee schedule of the standard AIA format. HMH argues that the contract's scope was limited only to the narrow initial services costing $11,550. G.D. Inc. argues that the agreement remains extant in addition to the 1985 AIA Contract without explanation of whether the 10% fee or the 7% fee governed future construction projects.
[3] While we might interpret paragraph 1.7 to allow oral authorization or confirmation in writing to extend the contract to services for future facilities outside the intent of the original "Project," the paragraph is ambiguous in that it may also reasonably be interpreted to require that agreement for future facilities must be authorized in advance or confirmed after the fact solely in writing.